TICOR TITLE INSURANCE COMPANY, Chicago Title Insurance Company, Safeco Title Insurance Company (now known as Security Union Title Insurance Company), Lawyers Title Insurance Corporation and Stewart Title Guaranty Company, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 89-3787.

United States Court of Appeals, Third Circuit.

Argued Aug. 28, 1990.

Decided Jan. 9, 1991.

Certiorari Granted Oct. 7, 1991.

On Remand from the Supreme Court of the United States June 12, 1992.

Argued on Remand from the Supreme Court Feb. 24, 1993.

Filed July 15, 1993.

James M. Spears, Gen. Counsel, Jay C. Shaffer, Deputy Gen. Counsel, Ernest J. Isenstadt, Asst. Gen. Counsel, Michael E. Antalics, Asst. Director, Bureau of Competition, Leslie Rice Melman (Argued), Jill Coleman, F.T.C., Washington, DC, for respondent.

Heidi B. Hamman Shakely, Asst. Counsel, Zella M. Smith, Asst. Counsel, Victoria A. Reider, Deputy Chief Counsel, Linda J. Wells, Chief Counsel, Commonwealth of Pennsylvania, Ins. Dept., Harrisburg, PA, for amicus curiae Commonwealth of Pennsylvania, Ins. Dept.

Before: HUTCHINSON, NYGAARD and ALITO, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

This case concerning petitioners' assertions of immunity from the antitrust laws is again before this Court on cross-petitions for review and enforcement of a Federal Trade Commission ("FTC") order after remand by the United States Supreme Court. *See FTC v. Ticor Title Ins. Co.,* —— U.S. ——, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). The FTC exercised subject matter jurisdiction under 15 U.S.C.A. § 45 (West Supp.1992). This Court exercises appellate jurisdiction under 15 U.S.C.A. § 45(c) (West 1973). On the merits, we will affirm the final order of the FTC holding that the petitioners are subject to antitrust regulation.

### I. *Procedural History*

A detailed statement of the case appears in the Supreme Court's opinion on *certiorari, see Ticor,* —— U.S. at —— – ——, 112 S.Ct. at 2173–76, and in this Court's earlier opinion, *see Ticor Title Ins. Co. v. FTC,* 922 F.2d 1122, 1125–27 (3d Cir.1991) (*"Ticor I"*). Therefore, we will give only a brief summary of the case's procedural history.

John C. Christie, Jr. (Argued), Patrick J. Roach, Bell, Boyd & Lloyd, Washington, DC, for Petitioners Ticor Title Ins. Co., Chicago Title Ins. Co. and SAFECO Title Ins. Co. (now known as Sec. Union Title Ins. Co.).

John F. Graybeal, Parker, Poe, Adams & Bernstein, Raleigh, NC, for petitioner Lawyers Title Ins. Corp.

David M. Foster, Michael P. Goggin, Fulbright & Jaworski, Washington, DC, for petitioner Stewart Title Guar. Co.

Petitioners are five of the nation's largest title insurance companies (collectively "Ticor").[1] On January 7, 1985, the FTC issued an administrative complaint alleging that Ti-

---

1. Specifically, petitioners include Ticor Title Insurance Company, Chicago Title Insurance Company, SAFECO Title Insurance Company (now known as Security Union Title Insurance Company), Lawyers Title Insurance Corporation, and Stewart Title Guaranty Company.

cor [2] had engaged in "[u]nfair methods of competition" in violation of section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.A. § 45(a)(1) (West Supp.1992), by agreeing collectively to set uniform rates for title search and examination services. Ticor accomplished this rate setting through state-licensed "rating bureaus" in thirteen states.

The administrative law judge ("ALJ") before whom the case was brought issued an initial decision and proposed order on December 25, 1986. The ALJ found Ticor's claim that the collective formulation of rates for title search and examination services is part of the "business of insurance" exempt from the FTC Act under sections 2(b) and 3(a) of the McCarran–Ferguson Act, 15 U.S.C.A. §§ 1012(b), 1013(a) (West 1976), was without merit. The ALJ also rejected Ticor's claim that the *Noerr–Pennington* doctrine [3] protected the challenged conduct from antitrust liability as joint efforts by petitioners to influence state regulators in matters of state policy. The ALJ also rejected Ticor's claim that the state action doctrine exempted them from antitrust liability in Connecticut and Wisconsin, but held that Ticor's rate setting actions in Arizona, Idaho, Montana, New Jersey, and Pennsylvania satisfied both prongs of the state action doctrine and were thus immune from antitrust regulation. Finally, the ALJ ruled that the FTC had failed to prove that Ticor used its rating bureau to establish uniform rates for title search and examination services in Ohio.

Ticor appealed the ALJ's initial decision. The FTC cross-appealed. On September 19, 1989, the FTC affirmed in part and reversed in part the ALJ's decision. The FTC affirmed the ALJ's holding on the McCarran–Ferguson Act and *Noerr–Pennington* issues, as well as its holding that the state action doctrine did not apply to Ticor's rate setting actions in Connecticut and · Wisconsin. It rejected Ticor's state action defense with respect to its rate setting actions in New Jersey, Pennsylvania, Montana, and Arizona, and reversed the ALJ to that extent. The FTC dismissed the complaint insofar as it concerned Ticor's rate setting actions in Idaho and Ohio.

The FTC's final order prohibited Ticor from fixing prices for title search and examination services in the six states where it had held Ticor violated the antitrust laws. The order nevertheless contained a proviso that permits collective establishment of rates for title services in any of these states if undertaken "pursuant to clearly articulated and affirmatively expressed state policy and where such collective activity is actively supervised by a state regulatory body." [4] Joint Appendix (Jt.App.) at 125.

In this Court, Ticor filed a timely petition to review the FTC's final order. The FTC filed a cross-petition for enforcement. *See* 15 U.S.C.A. § 45(c) ("To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission.")

. This Court reversed the FTC's final order on the ground that Ticor was entitled to immunity because the active supervision requirement of the state action doctrine was met in each state. *Ticor I*, 922 F.2d at 1140. In reaching this conclusion, we followed the United States Court of Appeals for the First Circuit's reasoning that the active supervision prong of the state action doctrine would be satisfied if the state regulatory program was staffed, funded and empowered by law. *Id.* at 1137 (citing *New England Motor Rate Bureau, Inc. v. FTC,* 908 F.2d 1064, 1071 (1st Cir.1990)).

---

**2.** The complaint made charges against a sixth title insurance company which have been settled. Thus, the FTC's final order affected only the five title insurance companies who have joined as petitioners before this Court.

**3.** The *Noerr–Pennington* doctrine immunizes agreements among competitors to influence legislative, judicial, or administrative action from antitrust liability. *See United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

**4.** This proviso merely restates the requirements of the state action doctrine. · *See infra* at 1135–36.

The Supreme Court granted certiorari to consider (1) whether this Court was correct in its statement of the law concerning the "active supervision" prong of the state action doctrine, and in its application of that law to the facts of the case, and (2) whether this Court exceeded its authority by departing from the factual findings entered by the ALJ and adopted by the FTC. *Ticor*, —— U.S. at ——, 112 S.Ct. at 2176.[5] On the first issue, the Supreme Court reversed. It held that although the criteria set forth in the First Circuit test of active supervision were relevant to the active supervision prong of the state action doctrine, they were not the exclusive measure of whether that prong was met. *Id.* at ——, 112 S.Ct. at 2179. The Court reasoned:

> Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme. The mere potential for state supervision is not an adequate substitute for a decision by the State. Under these standards, we must conclude that there was no active supervision in either Wisconsin or Montana.

*Id.* Having concluded that Ticor's acts in Montana and Wisconsin were not immune from antitrust liability because there was no active supervision, the Supreme Court remanded the case to this Court to determine whether the regulatory schemes of Connecticut and Arizona met the active supervision prong under the above standard. *Id.* at ——, 112 S.Ct. at 2180.

## II. *Statement of Facts*

We again refer the reader to the opinion of the Supreme Court and our earlier opinion for a detailed statement of facts. *See id.* at ——————, 112 S.Ct. at 2173–76; *Ticor I*, 922 F.2d at 1127–29. A relatively concise factual history is presented here.

The purpose of title insurance is to indemnify buyers and lenders for loss resulting from non-record defects in the title of a parcel of real estate. Such defects include those not discoverable from a search of the public records on the parcel, as well as losses caused by errors or mistakes in the search and examination. Negligence need not be proved in order to recover. Title insurance policies generally except matters that a search and examination of public records have identified, as well as any discrepancies that a survey has actually revealed or would have revealed if performed.

Originally, title insurance companies relied upon independent examiners to perform title search and examination services. As the business evolved, title insurance companies expanded and began to provide these services themselves. Today, a title insurance company may still issue a policy of title insurance after an abstractor or attorney unaffiliated with the insurance company performs the search and examination, but in many cases either an attorney-agent of the insurance company or a trained title insurance company employee performs the service. Some insurance companies, however, still use a list of approved attorneys whom a buyer or lender may then hire to perform the search and examination on which the title insurer bases its list of record exceptions to the insuring covenant.

An attorney may act as an attorney-agent for hypothetical insurance company A and at the same time act as an approved attorney for insurance company B. If company A hires the attorney to perform a search and examination as an attorney-agent, he will receive as compensation from the insurance company the price fixed by the insurance companies through the rating bureau in the state in which the property is located. In contrast, if a buyer or lender hires the attorney either directly or by reference to company B's list of approved attorneys, the attorney bills the buyer or lender at whatever rate they negotiate.

---

5. Before the Supreme Court, the parties confined their briefing on the first issue to the regulatory schemes of Wisconsin and Montana, and on the second issue to Connecticut and Arizona. *Ticor,* —— U.S. at ——, 112 S.Ct. at 2176. The FTC did not challenge this Court's ruling in *Ticor I* that the New Jersey and Pennsylvania schemes satisfied the "clearly established policy" requirement of the state action doctrine. *See infra* at 1135–36.

In many states, title insurance companies file only their rates for indemnification services (the "risk rate"). In some states a rate is also filed for search and examination services. In the latter case, the search and examination rate is identified separately from the rate charged for underwriting the risk insured against liability.

### III. *Issues on Appeal*

On remand, Ticor presents three issues. First, it argues that under the McCarran–Ferguson Act, 15 U.S.C.A. §§ 1011–15 (West 1976), its collective establishment of rates for title search and examination services falls within that Act's "business of insurance" exemption from federal antitrust laws. Second, Ticor asserts that the collective establishment of rates for title search and examination services was an agreement to influence legislative, judicial, or administrative action, and is therefore immune from the antitrust laws under the *Noerr–Pennington* doctrine. Finally, Ticor asserts that its filing of title insurance rates through state-chartered rating bureaus in Connecticut and Arizona was actively supervised by those states and thus not subject to the antitrust laws under the standards governing state action that the Supreme Court set out in the opinion that ordered this remand.

■ The FTC's legal conclusions are subject to plenary review. Its factual findings are conclusive if supported by substantial evidence. 15 U.S.C.A. § 45(c). Under the "substantial evidence" standard, a reviewing court "must accept the [FTC's] findings of fact if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2015–16, 90 L.Ed.2d 445 (1986) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)).

### IV. *Discussion*

#### A. *The McCarran–Ferguson Act*

■ Ticor argues that the collective filing of proposed rates for the search and examination activities of title insurers is exempt from antitrust liability under the McCarran–Ferguson Act (the "Act"). That Act provides a statutory antitrust exemption for activities that (1) constitute the "business of insurance," (2) are regulated pursuant to state law, and (3) do not constitute acts of "boycott, coercion or intimidation." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 219–20, 99 S.Ct. 1067, 1077, 59 L.Ed.2d 261 (1979). The only one of these three requirements at issue here is whether the challenged rate setting activities constitute the business of insurance. *See id.* at 211, 99 S.Ct. at 1073 (McCarran–Ferguson Act exempts from antitrust regulation only "business of insurance," not all activities of insurance companies).

■ Under *Union Labor Life Insurance Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), three criteria are relevant in determining whether a given practice constitutes the "business of insurance": (1) Whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the practice is limited to entities within the insurance industry. *Id.* at 129, 102 S.Ct. at 3009 (citing *Royal Drug*, 440 U.S. at 211–21, 99 S.Ct. at 1073–78.) None of the three is independently determinative. *Id.*

Ticor argues that search and examination services satisfy the first *Pireno* factor because of their logical and temporal relationship to the risk underwritten in the title insurance policy. In support, Ticor cites several pre-*Pireno* cases in which courts held that search and examination services are conditions precedent to the issuance of a title insurance policy, rather than a wholly separate endeavor. *See* Brief for Petitioners on Remand at 5–7 (citing *McIlhenny v. American Title Ins. Co.*, 418 F.Supp. 364, 369 (E.D.Pa.1976); *Schwartz v. Commonwealth Land Title Ins. Co.*, 374 F.Supp. 564, 574 (E.D.Pa.1974); *Commander Leasing Co. v. Transamerica Title Ins. Co.*, Civil Action No. C–3295 (D.Col.1972), *aff'd*, 477 F.2d 77 (10th Cir.1973); *In re Equifax Inc.*, 96 F.T.C. 844, 1101 (1980)). Ticor contends that the deter-

mination of what risks will be insured is at the heart of the business of insurance, and that title searchers and examiners decide what risks are underwritten by eliminating from coverage recorded defects of title.

Ticor ignores a critical fact: The title search and examination does not itself spread or transfer risk. At most, title searchers identify defects of title. Title searchers themselves have no power to insure against any risk they identify. The search and examination are like many other arrangements title companies make for services in an effort to reduce costs. Ticor cannot claim that its title searchers determine the risk it agrees to underwrite any more than it could make a similar claim regarding the services provided, for example, by its secretarial staff or by a physician employed to report on the health of applicants for health or life insurance. When a title insurance policy is issued, it is the insurer's decision to cover or refuse to cover the risks posed by the title searcher that triggers Ticor's obligation to indemnify the policyholder against the risks of title defect covered by the policy, whether from non-record defects or human error in the search. The title search and examination do not come under the first *Pireno* requirement of transferring or spreading the risk.

The second *Pireno* factor is whether the challenged practice is integrated into or encompassed within the relationship between the insurer and insured that flows from the policy. Historically, title search and examination services were provided by persons or entities separate from the issuer of the title insurance policy itself. Even today, entities other than title insurance companies provide title search and examination services. Thus, the second *Pireno* factor is not satisfied. The fact that title search and examination services, in many cases, still are not provided or performed by the title insurance companies themselves also indicates that the third *Pireno* criterion, whether the challenged practice is limited to entities within the insurance industry, is not satisfied either.

Ticor argues that court decisions and "other judicial developments" since the filing of the briefs in *Ticor I* confirm its belief that the collective filing of proposed rates for search and examination activities of title insurers is the "business of insurance" within the meaning of the McCarran–Ferguson Act and *Pireno*. Brief for Petitioners on Remand at 4. Ticor first points to the case of *Gahn v. Allstate Life Insurance Co.*, 926 F.2d 1449 (5th Cir.1991). In that case, the court of appeals applied *Pireno* to determine whether ERISA preempted a state statute. ERISA itself contains a provision exempting from preemption state laws that regulate the business of insurance. The issue before the *Gahn* court was whether a state statute, which precluded medical insurers from discontinuing coverage after a policyholder was diagnosed with a terminal illness, regulated the business of insurance. *Id.* at 1454. The Fifth Circuit held that the statute satisfied all three of the *Pireno* criteria: "[I]t can transfer the risk of non-coverage from an insured to the insurer; it is 'an integral part of the policy relationship between the insurer and the insured'; and it only applies to the insurance industry." *Id.* (quoting *Pireno*, 458 U.S. at 129, 102 S.Ct. at 3009). Accordingly, ERISA did not preempt the statute because the statute regulated insurance. *Id.*

Ticor argues *Gahn*'s holding that the state statute regulated the business of insurance even though it was directed at a practice "clearly intended to *exclude* risks from the insurer's coverage[,]" Brief for Petitioners on Remand at 9, is analogous to the practice of title insurers with respect to title searches. We disagree. The state statute the court considered in *Gahn* established certain conditions precedent to an insurer's power to cancel a pre-existing insurance contract. As such, the statute affected the substantive terms of the insurance contract, and thus squarely regulated insurance under ERISA's exemption of state insurance law from preemption. *Gahn*, 926 F.2d at 1454 (citing *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 742–43, 105 S.Ct. 2380, 2390–91, 85 L.Ed.2d 728 (1985)). An insurer's unilateral cancellation of a pre-existing health insurance policy would transfer risk from the insurer to the insured. The promise to indemnify against an unforeseen event is integral, *i.e.* encompassed within, to the insurer-insured relationship. Finally, because the

statute considered in *Gahn* affects only those aleatory contracts that are embodied in insurance policies issued by state regulated insurers, it is peculiar to the insurance industry. *See id.* *Gahn* does not persuade us that Ticor's action in setting rates for title searches and examinations is the business of insurance.

Ticor also cites *Mutual Reinsurance Bureau v. Great Plains Mutual Insurance Co.*, 969 F.2d 931 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 604, 121 L.Ed.2d 540 (1992). Like *Gahn,* this case involved ERISA's preemption of a state statute making arbitration provisions in insurance contracts unenforceable. The court of appeals held that the statute was a law regulating the business of insurance within the meaning of the McCarran–Ferguson Act, which ERISA excepted from preemption. *Id.* at 933. Ticor contends it is significant that the Tenth Circuit reached this result "[e]ven though arbitration clauses are not unique to insurance contracts." Brief for Petitioners on Remand at 9. The challenged statute in *Mutual Reinsurance,* however, as in *Gahn,* directly regulated a term of the insurance contract, unlike the regulatory schemes at issue here. Although arbitration clauses are not unique to insurance contracts, Ticor fails to recognize that the state statute in question in *Mutual Reinsurance* did not generally prohibit arbitration clauses. Rather, the statute at issue made such clauses unenforceable only when contained in insurance contracts. *See Mutual Reinsurance,* 969 F.2d at 933 ("Simply put, the Kansas legislature has placed limits on the enforceability of an agreement to spread risk...."). *Mutual Reinsurance* therefore does not support Ticor's position.

Finally, Ticor points to material in a brief the Solicitor General filed before the United States Supreme Court in *United States Department of Treasury v. Fabe,* previously pending at No. 91–1513 (U.S., *cert. granted,* — U.S. ——, 112 S.Ct. 1934, 118 L.Ed.2d 541 (1992), Brief for Petitioners filed July 23, 1992). In that case, the United States Court of Appeals for the Sixth Circuit had held that an Ohio statute establishing priority among claims made by various debtors in the course of liquidation of an insolvent insurer was a statute regulating the business of insurance under the McCarran–Ferguson Act. *Fabe v. United States Dept. of Treasury,* 939 F.2d 341, 351–52 (6th Cir.1991). In effect, this holding trumped a conflicting federal law giving priority to claims of the federal government. *See id.* at 343. Ticor points to the Solicitor General's argument that the state statute at issue in *Fabe* does not regulate the business of insurance because, *inter alia,* it "'does not regulate the terms of insurance policies'" and under fundamental principles of insurance, the policy defines the scope of the risk that the insurer assumed. Brief for Petitioners on Remand at 10 (quoting Brief for *Fabe* Petitioners at 14, 19). According to Ticor, the Solicitor General's rationale implicitly confirms its contention that title search and examination directly shape the terms of the title insurance policy because they determine what is excluded from the policy.

In the title insurance business, as we stated above, the proposition that the insurance policy defines the scope of the risk assumed by the insurer does not logically imply that the person conducting the title search and examination has defined the risk. The two are separate. We reject Ticor's effort, in reliance on the Solicitor General's brief in *Fabe,* to coax us into an analogy that is not compelled and seems to us unwarranted.

*Fabe* has now been decided, in a decision affirming in part and reversing in part the Sixth Circuit's decision, and does not compel a different result. *See United States Dept. of Treasury v. Fabe,* — U.S. ——, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). The precise issue in *Fabe* was whether the Ohio statute establishing the priority of creditors' claims in a proceeding to liquidate an insolvent insurance company was a law enacted "for the purpose of regulating the business of insurance" within the meaning of section 2(b) of the McCarran–Ferguson Act.[6] *Id.* at ——,

---

6. This section provides,

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by

113 S.Ct. at 2203. In deciding this issue, the United States Supreme Court expressly distinguished precedent holding that " 'ancillary activities' that do not affect performance of the insurance contract or enforcement of contractual obligations do not enjoy the antitrust exemption for laws regulating the 'business of insurance.' " *Id.* at ——, 113 S.Ct. at 2209 (quoting *Pireno,* 458 U.S. at 134 n. 8, 102 S.Ct. at 3011 n. 8). *Pireno,* for example, held that use of a peer review committee to advise the insurer whether charges for chiropractic services were reasonable and necessary was not part of the business of insurance because the committee "had nothing to do with whether the insurance contract was performed; it dealt only with calculating what fell within the scope of the contract's coverage." *Id.* (citing *Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009). Likewise, *Royal Drug* held that an insurer's agreements with participating pharmacies to provide benefits to policyholders was not part of the business of insurance: " 'The benefit promised to Blue Shield policyholders is that their premiums will cover the cost of prescription drugs except for a $2 charge for each prescription. So long as that promise is kept, policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies.' " *Id.* (quoting *Royal Drug,* 440 U.S. at 213–14, 99 S.Ct. at 1074 (footnote omitted)).

We think the title search and examination at issue in the present case is analogous to the peer review process in *Pireno* and the insurer-pharmacy reimbursement process in *Royal Drug.* Like those processes, the title search and examination has nothing to do with the actual performance of the title insurance contract. Instead, the title search and examination is " 'a matter of indifference to the policyholder, whose only concern is whether his claim is paid, not why it is paid.' " *Id.* (quoting *Pireno,* 458 U.S. at 132, 102 S.Ct. at 3010) (emphasis omitted).

In contrast, *Fabe* held that "the Ohio priority statute is designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." *Id.* As such, the statute was integral to the performance of insurance contracts and therefore was enacted for the purpose of regulating the business of insurance. *Id.*

In addition to pointing out that the focus in *Pireno* and *Royal Drug* was on the absence of any effect on the performance of the contract, *Fabe* drew another distinction between those cases and the Ohio priority statute that is material to the title search and examination issue before us. *Pireno* and *Royal Drug,* like this case, involved the scope of the antitrust immunity provided in the second clause of section 2(b), which makes "the business of insurance" itself exempt from the antitrust laws to the extent that it is regulated by state law. 15 U.S.C.A. § 1012(b). *Fabe,* on the other hand, involved the first clause of section 2(b), which exempts state laws enacted for the purpose of regulating the business of insurance from all other federal statutes. *Fabe,* —— U.S. at ——, 113 S.Ct. at 2209–10. The Supreme Court held that to equate the scope of the first clause with that of the second clause "would be to read words out of the statute." *Id.* The plain text of section 2(b) compels the conclusion that the first clause necessarily covers more than the second clause, which limits its exemption to the business of insurance regulated by state law. *See id.*

The Supreme Court reasoned that the more limited reading of the second clause better advances the legislative purpose of section 2(b): The first clause was intended to further Congress' primary objective of granting the states broad regulatory authority over the business of insurance, while the second clause accomplishes Congress' secondary goal of carving out only a narrow

---

any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as

amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C.A. § 1012(b) (West 1976).

exemption for "the business of insurance" from the federal antitrust laws. *Id.* at ——, 113 S.Ct. at 2210 (citing *Royal Drug,* 440 U.S. at 218 n. 18, 99 S.Ct. at 1077 n. 18). Because the Ohio priority statute distributed the insolvent insurer's assets to policyholders in preference to other creditors, its purpose was identical to the insurance company's primary purpose of paying claims made against policies. *Id.* Accordingly, *Fabe* affirmed the Sixth Circuit's holding that the Ohio priority statute was a law enacted for the purpose of regulating the business of insurance and thus exempt from the federal antitrust laws under the first clause of section 2(b) insofar as it established the priority of policyholders' claims against an insolvent insurer. *Id.,* —— U.S. at ——, 113 S.Ct. at 2210.

The Supreme Court nevertheless reversed the Sixth Circuit's holding that the priority statute was entirely immune under section 2(b) and held that to the extent that the statute was designed to further the interest of other creditors, it was not a law enacted for the purpose of regulating the business of insurance. · *Id.* In reaching this holding, the Court recognized,

> Of course, every preference accorded to the creditors of an insolvent insurer ultimately may redound to the benefit of policyholders by enhancing the reliability of the insurance company. This argument, however, goes too far: "But in that sense, every business decision made by an insurance company has some impact on its reliability ... and its status as a reliable insurer." *Royal Drug,* 440 U.S. at 216–17, 99 S.Ct. at 1076.

*Id.,* —— U.S. at —— - ——, 113 S.Ct. at 2212. Following the lead of *Royal Drug,* we too reject the notion that the indirect effects of the title search and examination process on the business of title insurance are sufficient to merit protection from antitrust liability under section 2(b). *See id.* at ——, 113 S.Ct. at 2212 (citing *Royal Drug,* 440 U.S. at 217, 99 S.Ct. at 1076).

The Supreme Court's recent decision in *Hartford Fire Insurance Co. v. California,* —— U.S. ——, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), bolsters this conclusion. The Supreme Court there reaffirmed that under·

*Royal Drug* and *Pireno* " 'the business of insurance' should .be read to single out one activity from others, not to distinguish one entity from another." *Id.* at ——, 113 S.Ct. at 2901. In *Royal Drug,* for example, the Court recognized that the insurance companies' agreement to fix prescription drug prices sold to Blue Shield policyholders " 'would be exempt from the antitrust laws if Congress had extended the coverage of the McCarran–Ferguson Act to the 'business of insurance companies.' But that is precisely what Congress did not do' ". *Id.* (quoting *Royal Drug,* 440 U.S. at 233 [99 S.Ct. at 1084] (footnote omitted)). Likewise, *Pireno* considered whether " 'a particular practice is part of the 'business of. insurance' exempted from the antitrust laws by § 2(b),' " *id.* (quoting *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009) (emphasis omitted), not whether a particular entity was entitled to antitrust immunity by virtue of its status as an insurance company. *See id.,* —— U.S. at ——, 113 S.Ct. at 2902 ("McCarran–Ferguson Act immunizes activities rather than entities") (citing *Royal Drug,* 440 U.S. at 232–33, 99 S.Ct. at 1083–84). The agreements that insurance companies make with parties wholly outside the insurance industry, like the retail pharmacists in *Royal Drug,* "are unlikely to be about anything that could be called 'the business of insurance,' as distinct from the broader 'business of insurance companies.' " *Id.* (quoting *Royal Drug,* 440 U.S. at 233, 99 S.Ct. at 1084). The Supreme Court ultimately held that the domestic insurance companies in *Hartford Fire* did not lose the antitrust immunity to which they were otherwise entitled under section 2(b) of the McCarran–Ferguson Act simply because they agreed or acted with foreign reinsurers that the Court assumed were not regulated by state law. *Id.; see id.* ("The alleged agreements at issue in the instant case, of course, are entirely different [from *Royal Drug* ]; the foreign reinsurers are hardly 'wholly outside the insurance industry[ ]' ").

Like the agreements in *Pireno* and *Royal Drug,* the title insurance companies in the present case entered agreements setting fees for a practice that is historically independent of the business of insurance: . Title search

and examination. Although some insurance companies today themselves provide title search and examination services, such services can be described, at most, as the "business of insurance companies" instead of the actual "business of insurance" as determined by application of the *Pireno* factors.

In short, the three "judicial developments" that *Ticor* has cited do not affect our conclusion that the title search and examination procedures at issue do not constitute the "business of insurance" under the standards for application of the McCarran–Ferguson Act that *Pireno* sets forth. Ticor's actions in setting rates for these services is therefore not entitled to immunity from the antitrust laws under the McCarran–Ferguson Act.

### B. *The Noerr–Pennington Doctrine*

 Ticor also argues that its collective rate setting is immune from antitrust liability under the *Noerr–Pennington* doctrine, which immunizes agreements to influence legislative, judicial, or administrative action. *See Pennington*, 381 U.S. at 657, 85 S.Ct. at 1586; *Noerr Motor Freight*, 365 U.S. at 127, 81 S.Ct. at 524. Specifically, Ticor contends that its activities are a protected form of "joint petitioning" because it did not agree to charge proposed rates without approval from each state's insurance department. *See* Brief for Petitioners on Remand at 12.

Ticor's argument is unavailing. The conduct which it refers to as "joint petitioning" of the government is in fact nothing more than action in a private marketplace. We agree with the FTC that Ticor's "collective rate setting efforts can 'more aptly be characterized as commercial activity with a political impact' ... than as political activity with a commercial impact." Jt.App. at 170 (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507, 108 S.Ct. 1931, 1941, 100 L.Ed.2d 497 (1988)).

### C. *"Active Supervision" Under the State Action Doctrine*

The FTC found no active state supervision of Ticor's filings for title search and examina-

tion fees in Arizona or Connecticut. It found Arizona's supervision deficient because state regulators accepted rate. filings simply on Ticor's representation that they were based upon rates historically produced by market competition. The Insurance Department conducted no examination of the Rating Bureau despite a statutory requirement of examination every five years. In Connecticut, the FTC concluded that regulators could not meaningfully supervise a critical component of the rate-making process because they could not directly regulate insurer expenses. In both states, the FTC concluded that regulatory scrutiny of certain miscellaneous filings was inadequate. Ticor argues that these conclusions must be reversed under the standards the Supreme Court articulated for determining what constitutes "active supervision" in its opinion on certiorari from our earlier decision in this case.

*California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) articulated a two-prong test for determining when private parties who take part in an agreement to fix prices are entitled to immunity from the antitrust laws under the state action doctrine. First, the state regulation must be " 'clearly articulated and affirmatively expressed as state policy' "; second, the policy must be " 'actively supervised' " by the state.[7] *Id.* at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)).

 In *Ticor* the Supreme Court attempted to clarify the meaning of the active supervision principle:

[T]he purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causa-

---

7. For a detailed history and explanation of the rationale behind the state action doctrine, *see*

*Ticor*, —— U.S. at ——–——, 112 S.Ct. at 2176–78.

tion inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

—— U.S. at ——, 112 S.Ct. at 2177. The Supreme Court, however, expressly declared that when prices are initially set by private parties, the person claiming immunity must show that the state undertook steps to evaluate the rate setting scheme. "The mere potential for state supervision is not an adequate substitute for a decision by the State." *Id.* at ——, 112 S.Ct. at 2179. This declaration significantly narrowed the reach of the active supervision prong of the state action exemption. The Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval. Bearing this in mind, we turn to the regulatory schemes of Arizona and Connecticut.

### 1. *Arizona*

■ The director of the State Department of Insurance licensed the Title Insurance Rating Bureau of Arizona in 1968. The Rating Bureau was statutorily authorized to establish joint rates for its members, including Ticor. The Rating Bureau, in theory, was subject to a wide range of latent powers possessed by the state insurance director. They included the power to audit the Rating Bureau's records and revoke its license, as well as broad authority to hold public hearings, promulgate rules, and issue orders discontinuing bureau practices found to be inconsistent with the insurance statute. The ALJ found that

actual use of these powers, however, is more hypothetical than real as shown by the fact that during the entire period 1968 to 1981 the Insurance Department conducted no examination of the Arizona Rating Bureau although there is a statutory requirement for such an examination at least once every five years.

Jt.App. at 79–80 (footnote omitted). Moreover, no public hearing was ever held in Arizona on joint rates that the Rating Bureau filed. No rate filing was ever disapproved. No hearings on title insurance rates filed by the Rating Bureau were ever held. The only hearings that were held involved allegations that insurers or their agents had given illegal inducements to realtors in order to obtain business. Arizona law did not require that insurance rate filings be subjected to public notice, comment and hearings, nor did it require that a written decision, reviewable by the state courts, be issued for each rate filing.

Instead, Arizona employed the "negative option" method of approving rates. Under this method, sometimes called the "file and use" approach, filed rates were deemed approved if the director took no action on them within fifteen days of their filing.[8] The Supreme Court criticized this method in Montana and Wisconsin and flatly stated that the active supervision standard is not met where, as here, "the potential for state supervision was not realized in fact." *Ticor,* —— U.S. at ——, 112 S.Ct. at 2179.

We recognize that this record contains some evidence of supervision by Arizona. Arizona's Insurance Department appears to have inquired into the Rating Bureau's 1968 general rate filing before letting it take effect. The FTC, however, found that in reality the Insurance Department approved the filing without undertaking any substantive review. Although the Department of Insurance inquired how the risk component of the 1968 filed inclusive rate was derived, there was no convincing evidence that either the Rating Bureau justified the rate increase or the State reviewed it.

Against this backdrop, the FTC found a lack of active supervision in Arizona. It did so after finding that the original 1968 filing went into effect essentially unreviewed, and that the Insurance Department failed to undertake the requisite formal examination of the Rating Bureau at least once every five years, even though an Arizona statute re-

---

**8.** Notwithstanding this statutory system, in practice the Arizona Rating Bureau's rate submissions were not put into effect until actually stamped "approved" by the director.

quired such an examination. It does appear that the Insurance Department, in 1980, announced a comprehensive investigation of the Rating Bureau, but apparently it was not actually conducted and the Rating Bureau went out of business in 1981. *Id.* at ——, 112 S.Ct. at 2175. Evidence in the record supports these findings. When this evidence of inaction is coupled with Arizona's persistent failure to exercise its statutorily established regulatory powers with any degree of consistency, we are unable to hold under the standard the Supreme Court enunciated in *Ticor* that the FTC's finding that Arizona did not actively supervise the rate filings was not supported by substantial evidence.

### 2. *Connecticut*

■ Connecticut adopted a hands-off policy of minimum state involvement in regulation of title insurance rates on the principle that the rates are best determined by a competitive market.[9] The Connecticut Rating Bureau, officially known as the Connecticut Board of Title Underwriters, was authorized to establish joint rates for its members after receiving a license from the state's insurance commissioner in 1965. The Connecticut Rating Bureau, like Arizona's, was theoretically subject to a wide array of latent powers possessed by the State Insurance Department under the applicable state regulatory statutes. Among the Department's powers were the authority to conduct audits and hold hearings on rates set by the Bureau. It did not do either. *Id.* at ——, 112 S.Ct. at 2174.

Prior to 1982, Connecticut allowed insurers to use rates as soon as they were filed. It discontinued this practice in 1982 and implemented a "file and use" approach that was tantamount to the negative option method we described in our analysis of Arizona's practice. Connecticut's "file and use" approach required insurers operating through rating bureaus to wait thirty days after filing rates before using them. If the Insurance Commissioner did not disapprove the rates during the thirty days, they were deemed approved and became effective.

The Connecticut Bureau filed only two major rate increases, one in 1966 and one in 1981. The Insurance Department wrote to the Bureau after its 1966 filing requesting additional justification for the proposed increases. It was concerned with whether the 1966 rate was for risk only or should also include search and examination costs. The Department later approved the increases. There is, however, no evidence in the record that the additional justification the Department requested was satisfactorily provided before approval.

In 1981 the Connecticut Rating Bureau filed for a 20% rate increase. A state insurance official testified that he reviewed the rate increase with care and discussed various components of the increase with the rating bureau. This official, however, did not have authority to act with respect to the cost data that were, in his opinion, excessive. *See id.* at ——, 112 S.Ct. at 2175.

Whether the supervisory scheme in Connecticut met the *Ticor* active supervision standard is a closer question than in Arizona. There is at least some evidence that the State Insurance Department took an interest in the rates the Bureau proposed. *See* Jt. App. 71 n. 192 (ALJ's recognition that rate increases and reductions filed between 1966 and 1983 sometimes were carefully reviewed but at other times approved with minimal review). There is also evidence, however, that Connecticut could not meaningfully examine the rates proposed because it never obtained the information necessary for a proper evaluation. *See* Jt.App. at 139 (FTC adopted ALJ's findings that State Insurance Department suffered from "dearth of information" that would have enabled it to assess

---

9. Connecticut law did not require that insurance rate filings be subject to public notice, comment, and hearings, or that a written decision, appealable to state courts, be issued with respect to each rate filing. State insurance regulators were opposed to any such strict procedural requirements on the grounds of cost and the inevitable delay in responding to market forces that such regulatory procedures would entail.

appropriateness of filed rates). On balance, we are again unable to hold, from the circumstances this record shows concerning operation of the statutory scheme and the degree of supervision Connecticut exercised over the two primary rate increases the Bureau proposed, that the FTC's finding that Connecticut's involvement with title insurance rates fell short of active supervision is not supported by substantial evidence.

## V. *Conclusion*

Ticor's collective establishment of rates for title search and examination services is not immune from the federal antitrust laws under either the "business of insurance" exception to the McCarran–Ferguson Act or the *Noerr–Pennington* doctrine. Ticor also has not shown that officials in either Arizona or Connecticut actively supervised the rate setting schemes by undertaking the necessary steps to evaluate the merits of the rates set. Therefore, Ticor may not claim immunity under the state action doctrine. For these reasons, the FTC's final order will be affirmed.

ALITO, Circuit Judge, dissenting:

I believe that the setting of uniform rates for title search and examination services is part of the "business of insurance" within the meaning of Section 2(b) of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b). I therefore dissent.

## I.

Section 2(b) of the McCarran–Ferguson Act makes the federal antitrust laws inapplicable to the "business of insurance" to the extent that such business is regulated by state law and is not subject to the "boycott" exception contained in Section 3(b), 15 U.S.C. § 1013(b). In this case, as the majority notes (maj. opinion at 1133), the petitioners' challenged activities are regulated by state law and do not fall within the "boycott" exception, and therefore the applicability of the McCarran–Ferguson Act turns on whether those activities constitute the "business of insurance."

In interpreting this statutory term, the majority properly looks to the Supreme Court's opinion in *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). There, the Court, relying on its prior decision in *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), wrote that three criteria are "relevant in determining whether a particular practice is part of the 'business of insurance' exempted from the antitrust laws by § 2(b).... " 458 U.S. at 129, 102 S.Ct. at 3009. These criteria, none of which is "necessarily determinative in itself," are (*id.*):

> *[F]irst,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

In the present case, the outcome produced by applying these criteria depends on the way in which the "practice" at issue is defined. The majority views the practice as "the title search and examination ... itself" (Majority Opinion at 1133–34), divorced from the issuance of the title insurance policy. The Commission took a similar approach, stating that it drew "a sharp distinction" between these two activities. Commission Opinion at 33; J.A. at 160.

Once the pertinent practice is defined in this way, it can be argued with considerable force, as the majority and the Commission have done, that most if not all of the *Royal Drug–Pireno* criteria cannot be met. Indeed, with respect to the first criterion, I fully agree with the majority that "[t]he title search and examination does not itself spread or transfer risk." Majority Opinion at 1133–34. Likewise, as to the third criterion, I cannot quarrel with the majority's conclusion that the practice of conducting title searches and examinations is not and has not historically been limited to entities within the insurance industry. Majority Opinion at 1133–34.

If, however, the practice at issue is defined differently—as the process of issuing title insurance, an indispensable component of which is the title and search examination—then the *Royal Drug–Pireno* criteria point to an entirely different result. The practice of issuing title insurance clearly transfers and spreads risk, is "an integral part of the policy relationship between the insurer and the insured," and is "limited to entities within the insurance industry." *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009.

Thus, the decisions reached by the majority and the Commission are correct only if they have correctly defined the "practice" that must be tested against the *Royal Drug–Pireno* criteria. And neither *Royal Drug* nor *Pireno* explains how a court should go about defining the scope of the "practice" to which their criteria should be applied.

## II.

While *Royal Drug* and *Pireno* do not address this issue, earlier decisions of the lower courts take the sensible view that a title search and examination performed as part of the process of issuing title insurance cannot be dissected from the rest of the policy-issuing process for the purpose of applying the McCarran–Ferguson Act.

In *Commander Leasing Co. v. Transamerica Title Insurance Co.,* 477 F.2d 77 (10th Cir.1973), the court of appeals upheld the district court's determination that title search and examination was not a "separate business" but rather a "condition precedent" to the issuance of title insurance and a part of the "business of insurance." *Id.* at 81. Similarly, in *Schwartz v. Commonwealth*

*Land Title Insurance Co.,* 374 F.Supp. 564, 574 (E.D.Pa.1974), Judge Becker aptly wrote:

> The investigation of the risk of loss prior to deciding whether to insure that risk is clearly part of the business of insurance. . . . [I]t would be in our view unrealistic, indeed ostrich-like, to separate the title search process from the pure insurance aspect of the title companies' activities and . . . to call only the latter "the business of insurance."

*See also McIlhenny v. American Title Ins. Co.,* 418 F.Supp. 364, 368–69 (E.D.Pa.1976).

I agree with this analysis. The Commission and the majority do not dispute that conducting a title search and examination is an indispensable element of the process of issuing a title insurance policy. They do not claim that any insurer issues title insurance without first performing such a search and examination, and in fact the statutes of many states expressly require title insurers to perform a title search and examination before issuing a policy. *See, e.g.,* N.J.Stat.Ann. 17:46B–9 (West 1985); 40 Pa.Cons.Stat.Ann. § 910–7 (1992). As a result, I believe that it is indeed "unrealistic" and "ostrich-like" to pretend that a title search and examination performed as part of the title insurance policy issuance process is a separate "practice" from the rest of that process.[1]

We must not forget that "the starting point in a case involving construction of the McCarran–Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself." *Royal Drug Co.,* 440 U.S. at 210, 99 S.Ct. at 1073; *see also Department of the Treasury v. Fabe,* —— U.S. ——, ——, 113 S.Ct. 2202,

---

1. I am not persuaded by the Commission's reliance on footnote nine of *Royal Drug Co.,* 440 U.S. at 213–14 n. 9, 99 S.Ct. at 1074 n. 9. In that case, the Court held that the "business of insurance" did not encompass agreements between Blue Shield and participating pharmacies regarding the prices that Blue Shield would pay the pharmacies for prescription drugs furnished to Blue Shield policyholders. While I find footnote nine somewhat unclear, I think it is best understood to mean only that the "business of insurance" under Section 2(b) does not necessar-

ily encompass everything that an insurance company must do, following issuance of policies, in order to ensure that promised policy benefits are provided to its insureds. *See Pireno,* 458 U.S. at 130, 102 S.Ct. at 3009 ("business of insurance" does not include arrangements that come into play only after the insurance contract is entered). By contrast, title searches and examinations occur before the title insurance contract is entered and play an essential role in defining the risk that is transferred. Thus, I do not think that footnote nine is controlling here.

2207, 124 L.Ed.2d 449 (1993). By its terms, Section 2(b) applies, without any qualification relevant here, to the "business of insurance," and the "ordinary understanding of that phrase" (*Royal Drug Co.*, 440 U.S. at 211, 99 S.Ct. at 1073) certainly includes those preparatory and administrative activities that are an indispensable part of the issuance of insurance policies.

Moreover, I see nothing in "the structure of the [McCarran–Ferguson] Act and its legislative history" (*id.*) that is sufficient to undermine this interpretation. I recognize that Congress's "primary concern" in enacting Section 2(b) was to ensure that "cooperative ratemaking efforts be exempt from the antitrust laws" (*id.* at 221, 99 S.Ct. at 1078), but I do not think that the Act's structure or legislative history demonstrate that Congress intended to limit Section 2(b)'s reach strictly to this area of "primary concern." On the contrary, the precursor bill proposed by the National Association of Insurance Commissioners (NAIC) contained a specific exemption that seems applicable to the activities challenged in this case. This exemption applied to "any cooperative or joint ... investigation [ ] or inspection agreement relating to insurance." 90 Cong.Rec. A4406 (1944). The Supreme Court has found that "[t]he views of the NAIC are particularly significant, because the Act ultimately passed was based in large part on the NAIC bill." *Royal Drug*, 440 U.S. at 221, 99 S.Ct. at 1078 (footnote omitted). Moreover, the Court has long recognized that Section 2(b) is not confined to the fixing of rates. As it stated in *SEC v. National Securities, Inc.*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969):

> The selling and advertising of policies, *FTC v. National Casualty Co.*, 357 U.S. 560 [78 S.Ct. 1260, 2 L.Ed.2d 1540] (1958), and the licensing of companies and their agents, *cf. Robertson v. California*, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366] (1946), are also within the scope of the statute.... Undoubtedly, other activities

of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class.

To be sure, the Court has held that Section 2(b) does not extend to certain insurance company activities that are not indispensable parts of the policy issuance process. See *Pireno, supra* (use of peer chiropractic review committee to determine whether charges were reasonable and necessary); ·*Royal Drug Co., supra* (price-fixing agreements between health benefit insurer and pharmacies); *SEC v. National Securities, Inc., supra* (misrepresentations and omissions in insurers' communications to stockholders); *SEC v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (issuance of annuities involving no true underwriting of risks); *see also Fabe*, — U.S. at —, 113 S.Ct. at 2209 ("*Pireno* and *Royal Drug* held only that 'ancillary activities' that do not affect performance of the insurance contract or enforcement of contractual obligations" are not entitled to antitrust exemption). But the majority in this case goes much further and holds that a central and indispensable element of the process of issuing title insurance does not constitute part of "the business of insurance." Whether the majority's decision represents sound antitrust policy, I do not believe that it is supported by the language, structure, or legislative history of the McCarran–Ferguson Act, and I therefore respectfully dissent.[2]

---

**2.** Because I would reverse the Commission's order based on Section 2(b), I do not address the

alternative grounds for reversal advanced by the petitioners.